290 F.2d 912
 A. Ronald PERKINS, Administrator of the Estate of Sue Garrett Perkins, Deceased, Plaintiff-Appellant,
v.
WAUKESHA NATIONAL BANK, Individually, and as Trustee, Edward G. Bach, Individually, as Executor of the Estate of Isabel Hadcock, Deceased, and as Trustee under the Last Will and Testament of Isabel Hadcock, Deceased, Defendants-Appellees.
 No. 13210.
 United States Court of Appeals Seventh Circuit.
 May 26, 1961.
 Rehearing Denied June 29, 1961.
 
 Clifford C. Kasdorf, Milwaukee, Wis., Carl Hoppe, San Francisco, Cal., for appellant.
 Floyd A. Brynelson, Madison, Wis., for appellees.
 Before DUFFY, KNOCH and CASTLE, Circuit Judges.
 KNOCH, Circuit Judge.
 
 
 1
 This appeal was taken from dismissal of complaint for alleged breach of trust by a trustee, the Waukesha National Bank. The appellant asserts a right to trace assets now in the hands of Edward G. Bach, the Executor and Trustee under the Will of Isabel Hadcock, deceased. The asserted right of such action arose out of administration of a trust set up by the settlor, Samper A. Perkins, by trust agreement made August 3, 1932, which transferred to the Waukesha Bank, as trustee, a portfolio of assets, including some properties which did not qualify as legal trust investments under the Wisconsin Statutes.
 
 The Trust Agreement provided:
 
 2
 "4. The assets and securities now comprised in said trust may be held by the trustee in its discretion, whether or not the same conformed to the rules prescribed by the laws of Wisconsin for the investment of trust funds, and the trustee in so continuing such assets in such trust fund pursuant hereto, shall be relieved from responsibility for depreciation or loss which may occur by reason of continuing to hold such trust fund, so long as the same is done in good faith; such assets and securities shall also be so held, so long as the donor shall survive, unless said trustee shall in the exercise of its sound discretion, deem it best to sell and dispose of such securities."
 
 
 3
 Not all of these assets were producing income. The Trust further provided:
 
 
 4
 "16. The donor states that he is at present the owner of practically all of the capital stock of the Manufacturers Building Company and also of forty-nine per cent of the capital stock of Perkins Heights, Inc.; neither of which corporations at the present time have income producing properties and it will be necessary, so long as said corporations do not have income producing properties, for the trustee to advance from the trust estate such necessary funds as are required for the protection of said properties, for the betterment of the same or in the interests of said corporations, and said trustee shall [be] hereby authorized, empowered and directed to make such advances, the same to be advanced from the principal of such trust estate, or from the income thereof, as in the judgment and discretion of the trustee it seem best."
 
 
 5
 Upon the death of Samper A. Perkins, which occurred on August 15, 1932, a sum not to exceed $50 per month was to be paid to his brother Eugene "for a period of time not to exceed five years" from Samper Perkins' death, "if said Eugene Perkins so long lives;" and a sum not to exceed $200 per month was to be paid his brother A. W. Perkins, or Mrs. Perkins (the parents of appellant) "in case of his demise with his wife surviving him, such payments to continue for a period of not to exceed five years."
 
 The Trust Agreement further provided:
 
 6
 "(d) At the expiration of said five year period, if not created before said time, a fund of Fifteen Thousand ($15,000) Dollars shall be created and set aside to create an income for the said Eugene Perkins, brother of said donor, should said Eugene Perkins continue to so long live and a fund of Fifty Thousand ($50,000) Dollars to be set aside and created for the use and benefit of said A. W. Perkins, and his said wife; the income from each of said respective funds to be paid to the said Eugene Perkins during his lifetime, when such trust fund shall cease and revert to the principal and be distributed as a portion of the residue herein and the income from said Fifty Thousand ($50,000) Dollars to be paid to the said A. W. Perkins, or his wife, or the survivor of them, during their respective lives, when said fund shall also revert to and be distributed as a part of the residue of this trust estate;
 
 
 7
 "(e) In determining the values of the securities so being placed in such trust funds, the same shall be appraised and determined by the trustee as hereinabove provided.
 
 
 8
 "(f) The net residue of any income from such trust estate shall be paid over to the sister of said donor, Mrs. Belle Hadcock, of Stevens Point, Wisconsin, until the expiration of said five year period, unless the said trust funds of Fifteen Thousand ($15,000) Dollars and Fifty Thousand ($50,000) Dollars, as set forth, shall be created and set aside prior to the expiration of said five year period, and when said funds are so set aside, if set aside prior to the expiration of said five year period, said trust shall cease as to the residue of principal and income of such trust fund, and the same be turned over to Mrs. Belle Hadcock, sister of said donor, or to her issue in case she does not leave a will distributing, dividing or disposing of the same;
 
 
 9
 "(g) On the date of the termination of the trust relating to said funds of Fifteen Thousand ($15,000) Dollars and Fifty Thousand ($50,000) Dollars, said funds are to revert into the residue of this trust estate and be distributed as herein directed: To the sister of said donor, Mrs. Belle Hadcock, or to her issue, or as directed in her will. It is further directed that any accrued income upon any of said securities constituting a portion of the trust estate shall belong to the life beneficiaries up to the date of their demise."
 
 
 10
 Although broad discretion was given to the Trustee and provision was made as further indicated:
 
 
 11
 "12. In the event that by the exercise of any discretion herein vested in the trustee, any loss or damage shall [accrue] to the trust estate, such loss or damage shall not be charged or imputed to the trustee, excepting only for bad faith shown in the exercise of its discretion."
 
 Samper Perkins also directed that:
 
 12
 "10. In making distributions of the principal of said trust estate, or setting aside any portion of such trust estate as hereinafter directed, the trustee may, in its discretion, appraise and distribute specifically any and all of the securities in which the trust estate shall be invested, or may sell or otherwise convert the same into money, or other securities, and may make such just and equitable distribution and division as in its discretion shall do justice between the parties; this power, however, to be exercised only with the approval and consent of my sister, Mrs. Belle Hadcock, during her lifetime." [Emphasis added.]
 
 
 13
 The $200 monthly payments to the A. W. Perkinses continued until June, 1940. There is no indication that the delay met with disapproval by the A. W. Perkinses. On June 25, 1940, the Trustee became the financial agent of Mrs. Hadcock.
 
 
 14
 Appellant takes the position that a breach of trust occurred when the Trustee Bank assumed a dual fiduciary capacity because of conflict between the interests of the A. W. Perkinses (who were to receive the income from the $50,000 trust fund to be set up for them) and the interests of Mrs. Hadcock, the remainderman. Appellant argues that it was to the interest of the A. W. Perkinses that assets of the highest yield available (consistent with security) be chosen to fund their $50,000 trust, while it was to the advantage of the remainderman, Mrs. Hadcock, to retain any such assets for distribution to herself.
 
 
 15
 Under date of June 25, 1940, Mrs. Hadcock wrote to the Trustee Bank, as follows:
 
 
 16
 "Gentlemen:
 
 
 17
 "According to the terms of Mr. Perkins' trust agreement under which you are acting, which agreement was dated the 3rd day of August, 1932, two trusts were created, one of $15,000.00, in favor of Eugene Perkins, which was to run so long as he might live. As you are aware, Mr. Eugene Perkins is now dead, and that trust has now terminated.
 
 
 18
 "The other trust provided for the setting aside of $50,000.00, of securities, to be held as a trust fund during the lifetime of my brother, A. W. Perkins, and his wife, or the survivor of them, the income to be payable to them, with the payment of $200.00 per month having been provided for them for the first five years.
 
 
 19
 "I understand you have been continuing to pay the sum of $200.00 a month to A. W. Perkins and his wife, ever since my brother, S. A. Perkins' death.
 
 
 20
 "According to the terms of the trust instrument, all of the property was given to me at the expiration of the five year period, subject to the two trusts above named, one of which is terminated and with the property reverting to me or my heirs at the termination of each respective trust.
 
 
 21
 "It is now necessary to set aside funds or create sufficient money to provide for the $50,000.00 which you are to hold in trust during the lifetime of A. W. Perkins and his wife, and it now seems advisable, in order to create said trust, for me to give my own individual note to you as trustee for the sum of $50,000.00, payable on demand, with the rate of interest at 5%, which will create sufficient so that you can very nearly continue the payment of the $200.00 a month to said A. W. Perkins and his wife.
 
 
 22
 "I realize that it would be difficult, if not impossible, for you to invest $50,000.00 in any securities which would be legal investments under the laws of Wisconsin, to create that amount, altho it is my desire for you to be provided with sufficient funds at least for the time being, to continue to pay $200.00 a month to my said brother and his wife. Accordingly, for the purpose of creating a trust principal of $50,000.00, as specified in said trust agreement, I am, for value received, handing you herewith, my own personal note in the sum of $50,000.00, * * * due on demand, drawing 5% interest, payable in monthly installments, it being my intention hereby to furnish you with the security which will be legal for the investment of trust funds to be held by you under the terms of the trust agreement for the benefit of my said brother A. W. Perkins, and Garrett Perkins, his wife, or the survivor.
 
 
 23
 "My said note will be secured by collateral, which is legal for the investment of trust funds, under the laws of Wisconsin.
 
 
 24
 "Your receipt to me for these securities will be appreciated."
 
 
 25
 The Trustee Bank accepted the note as the investment with which to fund the $50,000 trust.
 
 
 26
 Appellant contends that the mere existence of the dual capacity constituted such breach of trust as to enable appellant to trace such of the assets as the Trustee might have chosen in place of Mrs. Hadcock's note. As an example, appellant reviews the history of some shares of Hein-Werner Motor Parts Corporation stock, available among those original assets of the trust which did not meet the Wisconsin statutory requirements for trust investment, but which the Trustee was empowered to retain. It is appellant's position that the value of this stock was not only evident on June 25, 1940, but was actually known to the Trustee Bank through two of its officers, who served as officers of Hein-Werner, and to Mrs. Hadcock whose husband had been a director of Hein-Werner.
 
 
 27
 The assertion that the Trustee ought to have selected the Hein-Werner stock, to fund the Trust for the A. W. Perkinses, overlooks the veto power (on which we shall comment shortly) which was given to Mrs. Hadcock under the trust agreement.
 
 
 28
 On the question of dual capacity, both appellant and the Trustee Bank cite Ludington v. Patton, 1901, 111 Wis. 208, 86 N.W. 571, as controlling in a situation of this nature.
 
 
 29
 In the Ludington case, executors and trustees under the will of Harrison Ludington, and their attorney, while negotiating with his widow for a contract to permit probate of Harrison Ludington's will, (to the advantage of the other beneficiaries under that will) not only failed to inform the widow of her right to elect the more generous provisions made for her by law, but also neglected to suggest the widow obtain information regarding her legal rights. Summary of the findings of fact made by the Trial Court in that case includes the statement (at page 219 of 111 Wis., at page 574 of 86 N.W.):
 
 
 30
 "They did not willfully misrepresent or misstate to her any matter to her prejudice, but they concealed the facts and the true nature of the plaintiff's rights from her when they should have communicated the same to her because of their relation with her, as executors of the will and trustees of the estate. [The Court's italics]"
 
 
 31
 In the opinion of the Supreme Court of Wisconsin in Ludington (at page 239 of 111 Wis., at page 580 of 86 N.W.) quoted by appellant in his brief, the Court there said:
 
 
 32
 "* * * No rule is better established than that, if a trustee or a person standing in relations of trust and confidence to another deal with the cestui que trust or such other in respect to the subject of such trust, for his own benefit or that of others whom he represents, serving two persons at the same time, in form, when in contemplation of law he can serve but one loyally, the transaction cannot be upheld if called in question by the cestui que trust unless the trustee is able to prove to the satisfaction of the court by clear and satisfactory evidence, that the two were at arm's length in the transaction, that no confidence was reposed in him by the beneficiary, that the bargain was profitable to the beneficiary, and that he was fully informed in regard to the value of the property and the nature of his interest in it. (citations omitted.) The policy of the law is to regard all transactions of a contract nature, between a trustee and his cestui que trust, whereby the former obtains the interest of the latter, or some part thereof, in the subject of the trust, as presumptively fraudulent and void at the election of the latter. If such a transaction be permitted to stand it is upon condition that the trustee satisfies the court, fully and completely, that the cestui que trust received a full equivalent for that which he parted with, and that the transaction was to his advantage rather than to his disadvantage. The burden of proof in such a case rests upon the trustee to clearly free himself from the imputation of fraud arising from the facts, and the same is true where a person deals to his own advantage with a person with whom he sustains relations of trust and confidence. * * *"
 
 
 33
 In the case before us, the Trustee Bank clearly satisfied the District Court that the transaction was to the advantage rather than the disadvantage of the A. W. Perkinses as the income paid to them exceeded that which would have been secured had the Trustee Bank funded the trust with assets authorized by the Wisconsin statutes. We have reviewed the evidence and find no error in the District Court's findings on this point.
 
 
 34
 The collateral for Mrs. Hadcock's note consisted of promissory notes secured by real estate mortgages and ten U. S. Savings Bonds, all of which were assets of the Perkins estate, and which had a total value of $55,564.77. The notes secured by the real estate mortgages were not in the portfolio originally assigned to the Trustee Bank by Samper Perkins. It was the Trustee Bank's position that it was empowered to invest in such assets. The trust instrument was subsequently construed in First Wisconsin Trust Co. v. Perkins et al., 1957, 275 Wis. 464, 82 N.W.2d 331. The Trial Court had ruled that the trust instrument conferred broad powers with respect to investing the trust funds and that the Trustee was not required to comply with the Wisconsin statutory limitations on trust investments. On appeal, however, the Wisconsin Supreme Court held that the Trustee was authorized to hold the assets originally assigned to it whether or not those assets conformed to the Wisconsin limitations for investment of trust funds, but that the Trustee had not been empowered to make discretionary investments beyond the limitations of the Wisconsin statutes.
 
 
 35
 Appellant argues that investment in Mrs. Hadcock's note constituted a failure to comply with the applicable statute. In appellant's view the collateral for the note also fell short of the statutory requirements. The applicable statute, Wisconsin Statutes, 1939, Sec. 320.01 insofar as here pertinent, permitted investment in indebtednesses of the United States, in certain first lien real estate mortgages, or in promissory notes secured by pledge of bonds, or real estate mortgages in which investment was authorized. Section 320.02 provided a limitation as follows:
 
 
 36
 "The proportion of any one trust fund that may be invested by * * trustee in notes * * * the value of which is dependent upon the same persons * * * shall be subject to limitations as follows:
 
 * * * * * *
 
 37
 "(3) When it exceeds twenty thousand but does not exceed fifty thousand dollars, thirty per cent thereof; * * *"
 
 
 38
 Appellant contends that the maximum 30% limitation was here exceeded. A $23,000 mortgage note signed by John Nicholas Weber and Evelyn Weber was included in the collateral. Thus, appellant asserts, the statutory limit was exceeded. The Trustee Bank replies that the total collateral exceeded the requisite $50,000 by $5,564.77; hence only $17,435.23 of the Weber mortgage was required for compliance with the statute. The mortgage note was signed by two persons, not only one, and, thus, the Trustee asserts, the limitation does not apply.
 
 
 39
 The District Court found that the Trustee and Mrs. Hadcock intended to comply with the statutes and that the investment was made in good faith.
 
 
 40
 In any event, it is undisputed that since May 15, 1943, the collateral notes of Mrs. Hadcock (and later of her executor) were secured by Government Bonds of the stated value of $50,000.
 
 
 41
 Even if there had been a three-year failure to comply with the statute by partial investment in unauthorized securities, there is no showing of damage to the A. W. Perkinses. In the event of any such breach of trust, the remedy is to require the Trustee to turn over, to the trust, the amount of such trust fund which has been placed in investments not permitted by statute, with interest at such rate as the Court finds trust funds invested in prescribed securities would have yielded under the circumstances. In re Guardianship of Uggen (Israels v. Amble), 1937, 224 Wis. 24, 29, 271 N.W. 326. In the absence of loss there can be no recovery of damages. United States Fidelity & Guaranty Co. v. Pullen, 1939, 230 Wis. 137, 143, 283 N.W. 462; In re Guardianship of Farness (Farness v. Central Wisconsin Trust Co.), 1937, 225 Wis. 383, 388, 273 N.W. 522, 525, where the Court said:
 
 
 42
 "The mere fact that the guardian failed to * * * invest * * * in securities specified in section 231.32, Stats., does not render the guardian liable for damages in the absence of proof that the ward sustained some loss."
 
 
 43
 The evidence in this case fully supports the District Court's finding that:
 
 
 44
 "19. The reinvestments by trustee exceeded the average yield on legal investments, and the plaintiff suffered no loss or damage as a result of the making of said reinvestments."
 
 
 45
 Appellant argues that substitution of Government Bonds in 1943 did not rectify the alleged violation of the trust three years earlier, relying on Oliver v. Piatt, 1845, 44 U.S. 333, 11 L.Ed. 622. There the trustee misappropriated trust assets and invested them in other property. The original assets were later repurchased for return to the trust. The beneficiary elected to trace the new more valuable property and was allowed to do so. The Court in Oliver said:
 
 
 46
 "The reason is, that this would enable the trustee to avail himself of his own wrong; and if he had made a profitable investment of the trust fund, to appropriate the profit to his own benefit, and by a repurchase of the trust fund to charge the loss or deterioration in value, if any such there had been, in the meantime, to the account of the cestui que trust — whereas the rule in equity is, that all the gain made by the trustee, by a wrongful appropriation of the trust fund, shall go to the cestui que trust, and all the losses shall be borne by the trustee himself. The option, in such case, to take the new or the original fund is, therefore, (as has been already suggested) exclusively given to the cestui que trust, and is given to him for the wisest purposes and upon the soundest public policy. * * *"
 
 
 47
 The Trustee Bank received no such profits as were misappropriated in Oliver. Appellant's view, however, is that the Trustee Bank, in its capacity as Mrs. Hadcock's financial agent, did physically receive the earnings of the Hein-Werner stock, and then diverted such earnings to Mrs. Hadcock instead of distributing them to the A. W. Perkinses. We cannot agree. The Trustee Bank was not given unlimited discretion to select assets to fund the $50,000 trust. It was bound by Mrs. Hadcock's right of veto on its selection. Appellant contends that the Trustee Bank failed to exercise any discretion and merely followed the dictates of Mrs. Hadcock. However, in accepting Mrs. Hadcock's suggestion, the Trustee Bank did take action, and in taking such action did exercise its discretion.
 
 
 48
 In oral argument appellant's counsel indicated that the Trustee Bank might have compelled Mrs. Hadcock's consent to the selection of the Hein-Werner stock, if the Trustee had chosen to fund the Trust with that stock, by withholding performance of the Trustee's other duties under the Samper Perkins Trust with respect to turning over to Mrs. Hadcock her share of the assets of the Trust. Such extortion of Mrs. Hadcock's consent would have done violence to the Settlor's clear intent.
 
 
 49
 From June 25, 1940, until its resignation May 17, 1955, when it was succeeded by the First Wisconsin Trust Company, as successor-trustee, the Trustee Bank paid the A. W. Perkinses $200 per month, retaining $100 per year as its fee. The First Wisconsin Trust Company received the full $50,000 in principal. It is stipulated that the average annual yield on legal trust fund investments during the period from August 3, 1937, to May 17, 1955, has not exceeded a 5% return.
 
 
 50
 On September 16, 1950, Mrs. Hadcock died. When the complaint herein was filed, Mrs. Hadcock's estate was in probate. Defendant-appellee, Edward G. Bach, is her executor, a trustee under her will and the transferee of the Hein-Werner stock which appellant seeks to restore to the trust.
 
 
 51
 The evidence supports the following findings of the District Court:
 
 
 52
 "16. The reinvestments by the trustee were made with the approval and consent of Isabel Hadcock as required by the terms of the trust agreement.
 
 
 53
 "17. The trustee received no benefit either directly or indirectly from the reinvestments in question.
 
 
 54
 "18. The agency agreement between the bank and Mrs. Hadcock did not constitute a fraud against the plaintiff."
 
 
 55
 We have carefully considered all other arguments advanced by appellant and find them to be without merit.
 
 
 56
 The judgment of the District Court is affirmed.